**CASE NO.: 22-13214**
**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**DAVID BIRCHFIELD AND MELISSA MCDICKINSON, Appellants**

**v.**

**KA'TORIA GRAY, Appellee.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**
**Case No. 2:17-cv-00595 RAH**

---

**BRIEF OF APPELLANTS**
**MELISSA MCDICKINSON AND DAVID BIRCHFIELD**

---

| | |
|---|---|
| Marion F. Walker<br>Of Counsel<br>(ASB L73M-0734)<br>FISHER PHILLIPS LLP<br>2100A South Bridge Parkway<br>Ste. 650<br>Birmingham, Alabama 35209<br>Telephone:  (205) 414-7419<br>Facsimile:  (205) 718-7607<br>Email: mfwalker@fisherphillips.com | Andrew J. Baer**,** *Pro Haec Vice*<br>Of Counsel<br>(LAB 35638)<br>FISHER PHILLIPS LLP<br>201 St. Charles Avenue<br>Suite 3710<br>New Orleans, LA 70170<br>Telephone (504) 522-3303<br>Facsimile (504) 529-3850<br>Email: abaer@fisherphillips.com |

Counsel for Appellant, Melissa McDickinson and David Birchfield

**Date: September 14, 2023**

# CERTIFICATE OF INTERESTED PERSONS

No. 22-13214          David Birchfield et al. v. Ka'toria Gray

---

**District Court Judge R. Austin Huffaker, Jr.**

**District Court Judge Emily C. Marks**

**District Court Judge Myron H. Thompson**

**Magistrate Judge Wallace Capel, Jr.**

**Magistrate Judge Stephen Michael Doyle**

**Magistrate Judge Jerusha T. Adams**

**Baer, Andrew** Counsel for David Birchfield and Melissa McDickinson

**Birchfield, David, Appellant**

**Edwards, Sonya** – Counsel for Plaintiff

**Elrod, Bobby** – Employee of Koch Defendant Koch Foods, Inc. and/or Koch Foods of Alabama, LLC

**Fancher, Sharonda Childs** – Former Counsel for Defendants Koch Foods, Inc. and Koch Foods of Alabama, LLC

**Fisher Phillips LLP** – Counsel for Appellants Melissa McDickinson and David Birchfield

**Goerdt, Corey Joseph Myers -** Former Counsel for Appellants

**Guerrier, Charles E.** – Counsel for Plaintiff/Appellee

FP 48185123.1

**Haynes, Alicia K.** – Counsel for Plaintiff/Appellee

**Haynes & Haynes, PC** - Counsel for Plaintiff/Appellee

**Heather Leonard, PC** – Counsel for Plaintiff/Appellee

**Koch foods of Alabama, LLC** – Defendant

**Jackson, Steven** – Witness

**Karlson, Daisy Christina** – Former Counsel for Defendants Koch Foods Inc. and Koch Foods of Alabama, LLC

**Koch Foods, Inc.** – Defendant

**Leonard, Heather Newson** – Counsel for Plaintiff/Appellee

**McDickinson, Melissa,** Appellant

**Reese, Annalese Herndon** – Former Counsel for Appellants Melissa McDickinson and David Birchfield

**Smith Ashley Nicole of Miller Smith, LLC** – Counsel for Steven Jackson

**Walker, Marion F.** – Counsel for Appellants Melissa McDickinson and David Birchfield

**Wilkinson, Cynthia Forman** – Counsel for Plaintiff/Appellee

FP 48185123.1

# CORPORATE DISCLOSURE STATEMENT

No. 22-13214          David Birchfield et al. v. Ka'toria Gray

Pursuant to Fed. R. App. 26.1, counsel also makes the following disclosures:

David Birchfield and Melissa McDickinson are individuals and have no corporate disclosure obligations.

Respectfully Submitted

*s/ Marion F. Walker*

**MARION F. WALKER**
Alabama Bar No. 0734-L73M
Of Counsel
**FISHER PHILLIPS LLP**
2100A South Bridge Parkway, Ste. 650
Birmingham, Alabama 35209
Telephone (205) 414-7419
Facsimile  (205) 718-7607
Email:  mfwalker@fisherphillips.com


Andrew J. Baer
(LSB 35638)
Of Counsel
**FISHER PHILLIPS LLP**
201 St. Charles Avenue
Suite 3710
New Orleans, LA 70170
Telephone (504) 522-3303
Facsimile (504) 529-3850
Email: abaer@fisherphillips.com


**COUNSEL FOR APPELLANT,
MELISSA MCDICKINSON AND
DAVID BIRCHFIELD**

iii

# STATEMENT ON ORAL ARGUMENT

Appellants request oral argument. This case presents important questions to the Circuit regarding costs awards and the evaluation of the legal sufficiency of the evidence to submit punitive damages to a jury.

/s/*Marion F. Walker*
Marion F. Walker
Attorney for Appellant
Melissa McDickinson and
David Birchfield

FP 48185123.1

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................... i

CORPORATE DISCLOSURE STATEMENT ................................................ iii

STATEMENT ON ORAL ARGUMENT ................................................... iv

TABLE OF AUTHORITIES ................................................................... vii

STATEMENT REGARDING ADOPTION OF BRIEFS AND OTHER PARTIES ............................................................................... xi

REFERENCES TO THE RECORD ................................................................... xi

JURISDICTIONAL STATEMENT ................................................................... 1

STATEMENT OF THE ISSUES ................................................................... 3

STATEMENT OF THE CASE ................................................................... 3

    Course of Proceedings ................................................................... 3

    Statement of Facts ................................................................... 7

SUMMARY OF THE ARGUMENT ................................................................... 26

ARGUMENT ................................................................... 29

    I.   Lack of Sufficient Evidence of Assault and Battery ...................... 29

        A.   Relevant Law ................................................................... 30

        B.   Actions by Appellants and the Manner and Spirit in Which They Took Place Do Not Amount to Assault and Battery ................................................................... 32

    II.   Lack of Sufficient Evidence to Sustain Punitive Damages Verdict ................................................................... 41

        A.   Applicable Law ................................................................... 42

        B.   Gray Failed to Show Any Actions of Appellants Warranted An Award of Punitive Damages ...................... 44

    III.   District Court Erred to Reversal in Award of Costs to Gray ........ 48

        A.   Gray Was Not a Prevailing Party Entitled to Costs ............. 49

        B.   Voluntary Dismissal Without Prejudice Does Not Support Prevailing Party Status ................................................. 53

FP 48185123.1

CONCLUSION .......................................................................................... 54

CERTIFICATE OF COMPLIANCE ........................................................... 55

CERTIFICATE OF SERVICE ................................................................... 56

FP 48185123.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abel v. Dubberly,*
　210 F. 3d 1334 (11th Cir. 2000) ..................................................................43

*Allstate Ins. Co. v. Jones,*
　763 F. Supp. 1101 (M.D. Ala. 1991) ...........................................................52

*Anderson v. Liberty Lobby,*
　477 U.S. 242 (1986).............................................................31, 40, 42, 43

*Beach Blitz Co. v. City of Elizabeth,*
　13 F. 4th 1289 (11th Cir. 2021) ..................................................................49

*Berry v. Fite,*
　590 So. 2d 884 (Ala. 1991).................................................................44, 46

*Buckhannon Board & Care Home v. West Va. Dep't. Health &*
　*Human Services,*
　532 U.S. 598, 121 S. Ct. 1835, 149 L.Ed2d 855 (2001) ............................49

*Celotex Corp. v. Cathrett,*
　477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ...........................31

*Chaney v. City of Orlando,*
　483 F. 3d 1221 (11th Cir. 2007) ....................................................30, 41, 43

*Chapman v. A-1 Transport,*
　229 F. 3d 1012 (11th Cir. 2000) .............................................................49, 50

*Cheshire v. Putnam,*
　54 So. 3d 336 (Ala. 2010)...........................................................................43

*Coca-Cola Bottling Co. United v. Stripling,*
　622 So. 2d 882 (Ala. 1993)..........................................................................44

*CRST Van Expedited, Inc. v. Equal Employment Opportunity*
　*Commission,*
　578 U.S. 419, 136 S. Ct. 1632, 1646,194 L. Ed 2d 707 (2016) .................52

FP 48185123.1

*East Iowa Plastics, Inc. v. PI, Inc.*,
832 F. 3d 899 (8th Cir. 2016) ......................................................................50

*Geeslin v. Morrison Mgmt., Specialists, Inc., et al*,
No. 2:06-cv-410, 2007 WL 9711634 (N.D. Ala. 2007) ...................................38

*Harper v. Winston County*,
892 So. 2d 346 (Ala. 2004)..........................................................30, 33, 35, 37

*Harrison v. Mitchell*,
391 So. 2d 1038 (Ala. Civ. App. 1980).........................................................47

*Hines v. Riverside Chevrolet-Olds, Inc.*,
655 So. 2d 909 (Ala. 1994)...........................................................................45

*Kidd v. Mando Am. Corp.*,
870 F. Supp. 2d 1297 (M.D. Ala. 2012)........................................................51

*McCants v. Ford Motor Co., Inc.*,
781 F. 2d 855 (11th Cir. 1986) ...............................................................53, 54

*McKitt v. Ala. Bev. Control Board*,
2:12-cv-673 (M.D. Ala. Nov. 26, 2013) ........................................................49

*Murdoch v. Medjet Assistance, LLC*,
294 F. Supp. 3d 1242 (N. D. Ala. 2018).................................................34, 36

*Ex parte Norwood Hodges Motor Co.*,
680 So.2d 245 (Ala.1996)..............................................................................45

*Peete v. Blackwell*,
504 So. 2d 222 (Ala. 1986).........................................................42, 44, 46, 47

*Pensacola Motor Sales, Inc. v. Shore Toyota, LLC*,
684 F. 3d 1211 (11th Cir. 2012) .....................................................................7

*Perry v. Serenity Behavioral Health Systems*,
2010 WL 11537703 (S.D. Ga. Mar. 30, 2010)...............................................52

*Reeves v. Sanderson Plumbing Products*,
530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed 2d 105 (2000) ...............................32

FP 48185123.1

*Royal Palm Props LLC v. Pink Palm Prop. LLC*,
38 F. 4th 1372 (11th Cir. 2022) ......................................................6, 29, 49, 50, 52

*Senn v. Alabama Gas Corp.*,
619 So. 2d 1320 (Ala. 1993).................................................................................42

*Simmons v. Frank Norton, LLC*,
No. 2:15-cv-00147 (N.D. Ala. July 27, 2017)................................................35, 39

*Simmons v. Mobile Infirmary Medical Center*,
391 F. Supp. 2d 1124 (S.D. Ala. 2005) ...............................................................39

*Smith v. The Attorney General State of Alabama*,
2:17-cv-297 RAH (M. D. Ala. Oct. 6, 2020).......................................................51

*Smith v. Glasscock*,
2:18-cv-870-ECM (M.D. Ala. Mar. 29, 2022) .....................................................52

*Smith v. Metro. Sec. Servs., Inc.*,
No. 12-cv-12711 ** 11-12 (11th Cir. Sept. 18, 2013) ........................................48

*St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.*,
5 F. 4th 1235 (11th Cir. 2021) .............................................................................31

*Stancombe v. New Process Steel, LP*,
No. 2:13-cv-1134 (N.D. Ala. 2015).....................................................................31

*Surrency v. Harbison*,
489 So. 2d 1097 (Ala. 1986)............................................. 30, 31, 34, 38, 42, 44

*Tunison v. Continental Airlines Corp., Inc.*,
162 F. 3d 1187 (D.C. Cir. 1998).........................................................................50

*United States v. $70,700*,
929 F. 3d 1293 (11th Cir. 2019) .........................................................................54

*Vinson v. Koch Foods of Ala., LLC*,
No. 2:12-cv-1088-ECM-SRW, 2019 WL 6971497 (M. D. Ala. Jan.
29, 2019) (*see* App'x. Tab 20, n.1)......................................................................51

*Wilborn v. Southern Union State Cmty. Coll. et al.*,
720 F. Supp. 2d 1274 (M.D. Ala. 2010)......................................................35, 37, 39

FP 48185123.1

*Young v. AlaTrade Foods, LLC*,
 No. 2:18-cv-00455 (N.D. Ala. Sept. 6, 2019) .......................................................37

*Zavala v. Sexton, et al.*,
 No. 2:17-cv-02168 (N.D. Ala. Sept. 5, 2019) .......................................................37

**Statutes**

28 U. S. C. §§ 41 and 1291 .......................................................................................1

28 U. S. C. § 1331 .....................................................................................................1

28 U. S. C. §1367 .......................................................................................................1

28 U. S. C. §1391 ......................................................................................................1

42 U. S. C. §1981 .......................................................................................................1

42 U. S. C. § 1981 and Title VII .............................................................................3

42 U. S. C. §2000e-5(f)(3) ........................................................................................1

42 U. S. C. Title VII..............................................................................................1, 4

Ala. Code Section 6-11-20(a) .................................................................................42

Ala. Code Section 6-11-20(b)(4) ............................................................................42

**Other Authorities**

Fed. R. Civ. P. Rule 50(a) .........................................................................................5

Fed. R. Civ. P. Rule 50(b)..................................................................2, 5, 29, 31, 43

Fed. R. Civ. P. Rule 54(d)........................................................................................49

Fed. R. Civ. P. Rule 404(b)..................................................................................4, 29

T. M. Cooley, The Elements of Torts, [Callaghan and Company,
 Chicago 1895]......................................................................................................30

# STATEMENT REGARDING ADOPTION OF
# BRIEFS OF OTHER PARTIES

Appellants do not adopt any brief of another party.

/s/*Marion F. Walker*
   Marion F. Walker
   Attorney for Appellants
   Melissa McDickinson and
   David Birchfield

# REFERENCES TO THE RECORD

Citation reference to the record is to the district court document number and page and line numbers assigned by the court reporter pursuant to 11th Cir. Rule 28-5. Citation to the Appendix are to "App'x." with the Tab number and document pages, as appropriate. References to trial exhibits are to the district court Doc 503 and district court assigned number followed by "PX." number for plaintiff exhibits and "DX." Number for defendants' exhibits.

FP 48185123.1

# JURISDICTIONAL STATEMENT

## District Court Jurisdiction

State claims for torts of assault, battery, invasion of privacy and intentional infliction of emotional distress were brought by Ka'Toria Gray against Melissa McDickinson, David Birchfield ("McDickinson," "Birchfield," or "Appellants") and Koch Foods of Alabama, LLC ("Koch Foods"), along with federal claims for hostile work environment based on sexual harassment under 42 U. S. C. Title VII, retaliation under 42 U. S. C. §1981 and 42 U. S. C. Title VII for complaints of race discrimination, sexual harassment under 42 U.S.C. Title VII, and retaliation under 42 U. S. C. Title VII. Subject matter jurisdiction was premised on 28 U. S. C. § 1331 and 42 U. S. C. §2000e-5(f)(3) for the federal cause of action. Supplemental jurisdiction over the state law claims existed pursuant to 28 U. S. C. §1367. Personal jurisdiction and venue existed pursuant to 28 U. S. C. §1391.

## Appellate Jurisdiction

Appellate jurisdiction arises under 28 U. S. C. §§ 41 and 1291 which designate the Eleventh Circuit Court of Appeals to hear appeals of final judgments from the district courts of Alabama. After a trial, a Final Judgment for assault and battery was entered against McDickinson for $5,000 in compensatory damages and $20,000 in punitive damages, taxing costs against her. (App'x. Tabs 11, 13). A Renewed Motion for Judgment as a Matter of Law (App'x. Tab 15) dated March 22, 2022 was

FP 48185123.1

denied by Order dated July 28, 2022. **(**App'x. Tab 19). The Final Judgment regarding costs was amended by Order dated July 28, 2022 declaring Gray a prevailing party and awarding costs for defending the counterclaims. (App'x. Tab 20, p. 2). Gray filed a Bill of Costs (Doc. 518) to which McDickinson objected on May 4, 2023. (Doc. 524) On July 28, 2022, in response to Gray's Motion for Fees As Costs and Sanctions (App'x. Tab 16, "Motion for Fees"), the district court designated Gray as a prevailing party on the dismissed counterclaims and thereby entitled to costs for that defense. On August 22, 2022, McDickinson filed a Motion for Reconsideration of Order Awarding Costs to Plaintiff as Prevailing Party on Counterclaims or in the Alternative Motion to Deny Costs to Plaintiff. (App'x. Tab 24, "Motion for Reconsideration"). The motion was denied on December 12, 2022. (App'x. Tab 26).

Appellants timely obtained an extension to file and timely filed on September 26, 2022 Notice of Appeal (App'x. Tab 23) from "the Final Judgments entered March 17, 2022, all interlocutory orders, evidentiary rulings and trial rulings affecting their rights, including subsequent costs entered against them . . . ." and from the denial of the renewed Rule 50(b) motion.

FP 48185123.1

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**

1.      Whether there was sufficient evidence for submission to the jury of assault and battery against McDickinson or Birchfield and to support the verdict.

2.      Whether Gray showed clear and convincing evidence of wanton, oppressive or malicious actions by McDickinson or Birchfield to sustain the verdict for punitive damages for assault and battery.

3.      Where Gray prevailed on two claims and McDickinson and Birchfield each prevailed on two claims, is Gray a proper prevailing party in any respect for purposes of awarding costs?

**STATEMENT OF THE CASE**

**Course of Proceedings Below**

Gray's Third Amended Complaint (App'x. Tab 2), which is actionable, brought claims for invasion of privacy, assault and battery, outrage and negligent/wanton supervision, training, and retention and against McDickinson, Birchfield and Koch Foods. Additional federal claims were brought against Koch Foods for race retaliation under 42 U. S. C. § 1981 and Title VII Sexual Harassment and Retaliation. (App'x. Tab 2).[1] Appellants answered the Third Amended Complaint and filed counterclaims for slander against Gray on June 4, 2018. (App'x. Tab 3). Gray timely filed an Answer to the Counterclaims. (App'x. Tabs 5).

---

[1] Filings by Koch Foods are not included here because it obtained a verdict at trial and is not a party to this appeal.

FP 48185123.1

Discovery took place between January 2018 and February 28, 2020. (Doc. 22, 144). As a part of McDickinson's Initial Disclosures on November 10, 2017, a photograph of Gray purportedly kissing McDickinson on the cheek was produced in pdf format. (App'x. Tab 12, Doc. 503:87, DX. 89).

On August 3, 2020, Appellants filed Motions for Summary Judgment on claims for invasion of privacy, outrage, assault and battery and punitive damages. (Docs. 249, 250). Koch Foods filed a dispositive motion on the federal claims. (Doc. 248). Gray filed summary judgment on McDickinson's counterclaim. (Doc. 253). After oral argument, the Court denied the Motions for Summary Judgment on January 14, 2022. (Doc. 392-394). The issues for trial were: claims for assault, battery, invasion of privacy, outrage, negligent/wanton supervision, training and retention, and Title VII hostile work environment based on sexual harassment and Appellants' counterclaims for slander. (Doc. 443). Trial was set for February 28, 2022. *Id.*

On February 2, 2022, McDickinson, Birchfield and Koch Foods filed a Motion to Bifurcate Liability and Damages in order to avoid the introduction of what Gray claimed was evidence of lack of damages arising from the counterclaims for defamation but amounted to rumors and gossip about Appellants they contended violated Rule 404(b), Fed. R. Civ. P. (Doc. 422). Following a hearing, Appellants moved on February 24, 2022 to dismiss the counterclaims with prejudice, costs taxed

4

as paid. (App'x. Tab 7). Gray filed an opposition to the dismissals, asserting she had incurred attorney fees and cost of defense. (Doc. 452). On February 25, 2022 the court granted the motion to dismiss the counterclaims, reserving the issue of taxation of costs following the trial (App'x Tab 8) and denied the Motion to Bifurcate. (Doc. 461).

The case was called for trial on February 28, 2022 and a jury was selected. At the end of Gray's case, Appellants filed a Rule 50(a), Fed. R. Civ. P. motion for dismissal of the claims for assault and battery, outrage, invasion of privacy and punitive damages. (Docs. 484, 485). Gray filed oppositions March 12, 2022. (Docs. 489, 490). At the close of all of the evidence, Appellants filed a joint Rule 50(b) motion for dismissal of all claims. (App'x. Tab 9). On March 15th the jury entered a verdict in favor of Koch Foods on all claims, in favor of Appellants on invasion of privacy and outrage and in favor of Gray on assault and battery. (App'x. Tab 10). The jury awarded $5,000 in compensatory and $20,000 in punitive damages each against Appellants. (App'x. Tab 11). By Order dated March 17, 2022, the court denied the Rule 50(b) motion (App'x. Tab 14) and entered a Final Judgment consistent with the jury verdict, taxing costs against Appellants because of the loss of the assault and battery and counterclaims. (App'x. Tab 13, ¶¶ 1(c) & 2(c)).

Appellants filed a Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b), Fed. R. Civ. P. on March 22, 2022 (App'x. Tab 15) seeking to set

FP 48185123.1

aside the Final Judgment on the assault and battery and punitive damages claims. Gray filed a Motion for New Trial on April 14, 2022. (Doc. 513).

On April 20, 2022, Gray filed the Motion for Fees against Appellants, including fees and costs for work performed on defending the counterclaims. (App'x. Tab 16). The same day, Gray filed a Bill of Costs (Doc 518) including all costs in the litigation, except for defending the counterclaim in the amount of $ 98,539.88 against Appellants. Koch Foods also submitted a Bill of Costs. (Doc. 516).

Without notice, on May 4, 2022, the Clerk taxed costs against Appellants in the amount of $98,589.38. (Doc. 523). The same day, Appellants filed Objections to Gray's Bill of Costs, including the contention Gray was not the prevailing party (Doc. 524). On May 6, 2022, Appellants filed an opposition to the Motion for Fees. (App'x. Tab 17). Gray filed a Reply on May 16, 2022 without specific costs/fees claimed. (Doc. 526). Appellants filed supplemental authority bearing on the issue of costs arguing the holding in *Royal Palm Props LLC v. Pink Palm Prop. LLC,* 38 F. 4th 1372 (11th Cir. 2022) controlled. (Doc. 536).

The district court denied Appellants' Renewed Motion for Judgment as a Matter of Law and Gray's Motion for New Trial on July 28, 2022. (App'x. Tab 19). In response to Gray's Motion for Fees, the district court denied Gray costs, except to the extent of finding her a prevailing party and entitled to costs of defending the counterclaims, and directing an identification of those costs. (App'x. Tab 20, p. 3).

FP 48185123.1

Gray responded on August 12, 2022 by advising the court that all costs in the Bill of Costs (Doc. 518) were "inextricably intertwined" with the dismissed counterclaims, except for some items, reducing the total to $81,424.43. On August 26, 2022, Appellants filed the Motion for Reconsideration requesting oral argument. (App'x. Tab 22).

After obtaining a 30 day extension of time to file a Notice of Appeal on August 23, 2022 (Doc. 550), a joint Notice of Appeal was timely filed on September 26, 2022. (App'x. Tab 23). Gray timely filed a Notice of Cross-Appeal on October 11, 2022. (Doc. 560). The Motion for Reconsideration was denied December 12, 2022 and the court reserved for consideration, following a mandate from this Court, objections to Gray's bill of costs. (App'x. Tab 24).

## Statement of Facts[2]

### Background

Gray began her employment at Koch Foods in 2011 after being interviewed by Birchfield. (Doc. 576, 17:5; 18:12-13). Birchfield hired her as a licensed practical nurse ("LPN") in the safety and medical department in the debone plant. (Doc. 576, 17:7). After obtaining her bachelor's degree in nursing and earning a registered nurse ("RN") degree, Gray continued work as an RN for Koch Foods. (Doc. 576, 17:19-

---

[2] For purposes of this Brief, Appellants accepts Gray's evidence as true, otherwise crediting only that undisputed testimony the jury must accept as true. *See Pensacola Motor Sales, Inc. v. Shore Toyota, LLC,* 684 F. 3d 1211, 1226 (11th Cir. 2012). Appellants deny ever touching Gray.

FP 48185123.1

21). While at Koch Foods, she also worked at the Department of Youth Services, Cedar Crest Nursing facility, as well as other second jobs. (Doc. 576, 18:1-7). Gray's shift at the Department of Youth Services would last until 4:00 p.m., so Birchfield told her to come to Koch Foods after she left DYS. (Doc. 576, 18:8-14). Gray usually got off work from Koch Foods at 12:30 a.m. but also occasionally worked third and first shifts to do random drug screens. (Doc. 576, 18:15-21). Her supervisor at Koch Foods, up to March 22, 2016, was Frank Sheley. (Doc. 576, 19:1-3). Sheley's title was Complex Safety Manager and he worked in Cummings, Georgia. (Doc. 576, 19:5-7).

The Montgomery facility included the kill plant where the chickens are killed and debone plant. (Doc. 576, 19:17-20:2). About 500 people worked at the debone plant. (Doc. 576, 20:3-5). The nurses' station was located in the basement. (Doc. 576, 20:8-11). Perceiving it isolated from the rest of the plant and cold and loud, Gray did not think it was safe to be there. (Doc. 576, 20:8-13). Throughout her time at Koch Foods, Gray never had work meetings at midnight or on weekends. (Doc. 576, 101:16-20).

McDickinson was the HR Manager at the debone plant. Her office was also downstairs but closer to the entrance. (Doc. 576, 20:17-21). She graduated from Childersburg, AL High School, later joined the Army National Guard and in 2009 was assigned to the HR department at Ft. McClellan where she met Birchfield. (Doc.

FP 48185123.1

582, 3:19-22; 5:18-6:10; 6:14-7:17). While at Ft. McClellan, McDickinson began taking HR courses from Jacksonville State University and soon began "pestering" Birchfield for a job. (Doc. 582:1-14). McDickinson was hired in a temporary HR position and later promoted to HR Manager at the debone plant. (Doc. 582, 14:8-12). Initially she commuted over an hour each way to work from Weogufka in Coosa County, continuing her studies at Faulkner University in Montgomery, AL several nights a week. (Doc. 582, 12:13-23; 13:5-14:6). In or around the last part of August 2015, McDickinson leased a house and moved closer to Koch Foods. (Doc. 582, 14:19-15:6). It is undisputed the house was located on River Birch Drive in Prattville.

Before the events on November 14, 2015, Gray only saw McDickinson in passing and they had not exchanged personal information. (Docs. 576, 20:14-16; 582, 19:24-10). McDickinson had never issued Gray any sort of disciplinary action prior to that time [November 14, 2015]. (Doc. 576, 100:7-8). Gray had never asked McDickinson anything about work. (Doc. 582, 20:11-13). McDickinson did not tell Gray what job duties to do on a daily basis and their schedules barely overlapped. (Doc. 576, 100:12-17). Birchfield was the Complex HR Manager. His office was not at the debone plant and Gray did not often see him. (Doc. 576,20:22-21:1). Gray never reported to Birchfield. (Doc. 577, 4:11-16). Gray only knew McDickinson and Birchfield as "human resources." (Doc. 577, 42:18-21).

FP 48185123.1

Birchfield worked at Peco Foods, a chicken processing facility, in Tuscaloosa from 2000 until 2009, first in shipping and then in the HR role. (Doc. 579, 6:3-13). After 2001, Birchfield went back into the National Guard and was deployed several times during the time he worked at Peco Foods, including a year he served in Iraq as a dismounted infantry scout in the Army. (Doc. 579, 6:8-22). In 2009 Birchfield accepted the job of Complex HR Manager at Koch Foods in Montgomery. (Doc. 579, 7:16-23). The job required the oversight of performance of HR responsibilities for 1,600 to 2,000 employees working in the debone and kill plants, within two miles of each other, the feed mill in Hope Hull and beyond that the hatchery in Greenville. (Doc. 579, 8:4-24). He had a habit of traveling to each location at least two times a week. (Doc. 579, 8:25-9:11).

When he started work at Koch Foods, Birchfield was still a member of the national guard. (Doc. 579, 9:12-15). He was required to attend annual training at Fort McClellan in Anniston, AL two weeks annually and one week-end a month. (Doc. 579, 9:20-23). He met McDickinson there around 2010 or 2011. (Doc. 579, 10:16-18). Eventually she told him of her schooling to get an HR degree and asked him to keep her in mind for any openings. (Doc. 579, 13:11-20). When the previous HR Manager did not return, McDickinson was promoted to the position. (Doc. 579, 14:4-16, 16:6-19).

10

Steve Jackson was a union steward at the debone plant who Gray did not consider a friend. (Doc. 576, 24:4-10). Gray admits to having previously exchanged phone calls and/or text messages with Jackson where they discussed issues at work. (Doc. 576, 24:11-17). Prior to November 14, 2015, Gray had never socialized outside of work with Jackson, McDickinson or Birchfield. (Doc. 576. 24:18-25). Gray had been communicating with Jackson for several years. (Doc. 577, 27:7-10). They talked in the medical clinic and in the bull pen when she spent time there. (Doc. 577, 27:11-14, 15-20). The "bull pen" was on the top floor of the plant with an open area, surrounded by several offices, with vending machines. (Doc. 579, 45:21-46:11).

Jackson served as a union steward which required him to interact at work with McDickinson and Birchfield. (Doc. 584, 14:4-11). He got to know them "pretty well." (Doc. 584, 12:3-5). Appellants met Jackson's mother and sister and he knew McDickinson's sister. (Doc. 584, 12:21-13:2). On visits to McDickinson's house, he helped her hang curtains and move boxes. (Docs. 582, 15:7-12; 584, 13:3-6). McDickinson also cooked meals Jackson enjoyed. (Doc. 584, 13:12-13). He had seen William Summerville, who worked in Benefits at Koch Foods, at the house before. (Doc. 584, 13:14-14:3).

11

**Invitation to McDickinson's House**

The Saturday morning of November 14, 2015 McDickinson and her daughter went to Anniston for a doctor's appointment. (Doc. 582, 17:20-18:10). Jackson had previously agreed to come to McDickinson's home to help her move some boxes and after helping, left but returned later. (Doc. 582, 18:11-19:8; 20:19-21:5). In previous conversations with Jackson, McDickinson learned he was infatuated with Gray and said she "was one sexy, black woman" he would like to date. (Doc, 582, 19:15-23). Jackson testified only he, Birchfield and McDickinson were present in the home when Gray arrived. (Doc, 584, 9:1-4), McDickinson testified she, Jackson, her daughter and Summerfield were present at the home when Gray visited. (Doc. 582, 26:7-19). Birchfield testified he went to Florence on Friday and was in Florence, AL on Saturday night, November 14, 2015 watching football with his friend, Kenny Berry. (Doc. 579, 84:23-85:4; 96:19-97:8; 97:7-8; 114:14-19). Berry confirmed this. (Doc. 578, 3:25-4:19). Gray did not testify to speaking with Birchfield regarding her invitation to McDickinson's house on November 14, 2015.

Jackson testified McDickinson knew he was friends with Gray and asked him to invite her over, so he did. (Doc. 584, 8:4-13). McDickinson testified that Jackson told her he had invited Gray and she was coming over. (Doc. 582, 21:6-14). She did not see his texts with Gray that night. (Doc. 582, 22:7-20). McDickinson texted Gray

her address that night at 10:52 p.m. because Jackson told her Gray was coming over, and added "hurry up". (Doc. 582, 22:13-23:4. 23:8-13; Doc. 503:89, DX. 91).

On direct, Gray testified she was working at Cedar Crest Assisted Living on November 14, 2015 when she first received a call from Jackson to come to McDickinson's home; Gray refused. (Doc. 576, 21:2-5; 9-18). On Cross, Gray insisted she was working at Cedar Crest on November 14, 2015 and knew she was not at Koch Foods that day. (Doc. 576, 83:13-18; 99:5-18). At 10:42 p.m., Jackson texted Gray while she was still at Cedar Crest. (Doc. 576, 84:4-6, 22-24). Cedar Crest was about 15 minutes from where she lived. (Doc. 576, 85:17-24). Gray knows she was at home when McDickinson called her cell phone at 11:24 p.m. (Doc. 576, 86:10-18; 86:21-87:7, 13-18; 88:7-9). On re-Direct, Gray's counsel admitted into evidence Gray's Time Records from Koch Foods. (Doc. 577, 91:2-16; Doc 503:21, PX. 30). Gray was impeached by her counsel when she admitted the time entries for November 14, 2015 [Bates no. 177] showed she left work at Koch Foods on the evening of November 14, 2015 at 11:45 p.m. (Doc. 576, 98:25-99:6; Doc 503:21, PX. 30).

Inviting Gray to come over, McDickinson said there were others there from work and she wanted to talk about some work things. (Doc. 576, 21:22-22:5; 91:8-11; 99:18-23). Gray asked what she wanted to talk about and McDickinson said she would tell her when she arrived. (Doc. 576, 22:9-12). Gray did not tell McDickinson

13

that she was still working her shift at Koch Foods.[3] Gray's then-girlfriend, Dakota Jones, did not live with her. (Doc. 576, 103:22-24). Jones lived with her mother. (Doc. 576, 103:24-25). Jones stayed with Gray frequently but she was not going to stay with Gray that night. (Doc. 576, 104:1-5). Jackson called Gray at 11:36 p.m. when, Gray testified, she was at home or en route to McDickinson's home. (Doc. 576, 88:10-19; 89:16-21).

Having refused Jackson's telephone invitation to McDickinson's home, Gray exchanged several text messages with him, including one at 11:26 p.m. in which he asked her to "bring some powder, if you can." (Doc. 576, 25:1-11; Doc. 503:90, DX. 92). Gray said she thought it was a "typo." (Doc. 576, 25:23-26:3). Yet, Gray had heard the term "powder" was slang for cocaine and the following day would respond to his text saying, "Wake your ass up!" (Docs. 576, 102:19-21; 577, 62:1-7). Gray did not want to go to McDickinson's house but went because of the reference to talking about work and that other people would be there. (Doc. 576, 23:23-24:3).

**Gray's Arrival at McDickinson's Garage**

Arriving at McDickinson's residence, Gray was surprised there were only three people there – Jackson, McDickinson and Birchfield - and felt "awkward,

---

[3] Gray had taken off the day before. *See* Gray's testimony about texting with her supervisor about being off Friday, November 13, 2015. (Doc. 576, 172:11-173:18, Doc. 503:82, DX. 81).

uncomfortable" but she did not leave. (Doc. 576, 28:14-20; 29:24-30:7, 104:6-11). There was nothing preventing Gray from leaving. (Doc. 576, 104:12-14). Gray entered the "dark" garage, lit only by a strobe light on a table "shining," indeed, flashing with multiple colors around the garage, and rap music playing. (Docs. 576, 27:21-28:6; 105:1-9; 577, 30:6-32:20). Jackson testified the karaoke machine was on with some flashing lights and they had been singing but did not know if they sang when Gray was there. (Doc. 584, 9:5-9; 44:24-45:2).

Present in the garage were Jackson, McDickinson, Birchfield and Gray and McDickinson volunteered that Birchfield lived there with her. (Doc. 576, 28:9-13). Birchfield denied that was his house. (Doc. 579, 87:13-17). Jackson was certain Birchfield was there that night and lied to the contrary to the investigator months later, purportedly at Birchfield's request. (Doc. 584, 11:17-18; 112:12-113:4). People were drinking, it didn't seem like a work meeting, but Gray did not leave at that point because the garage door had closed "[s]o I couldn't just back up and walk out, but I mean, they're again, human resource." (Doc. 576, 28:21-29:1; 105:10-15).

**Conversing in the garage**

Two folding Auburn and Alabama chairs were positioned in front of a table behind which Birchfield was sitting playing music. (Doc. 576, 29:2-6; 30:20-22). Gray took a seat next to McDickinson, sitting "pretty close" together, across from Birchfield. (Docs. 576, 32:14-18; 577, 33:9-10). McDickinson told Jackson to get a

15

third bag chair out. (Doc. 582, 25:18-26:6). McDickinson asked if she could trust Gray. Gray asked about what. McDickinson "implied" she knew Gray had applied for a promotion in the medical department and she would definitely get it. (Doc. 577, 13:12-18). Gray did not know the job duties or pay of the position which no one held at the time but she was interested in it. (Doc. 577, 13:12 – 16:1). McDickinson then "mentioned" they needed her help in getting rid of Betty Stabler[4] who was causing trouble at the plant. (Doc. 576, 30:23-31:5). Gray told McDickinson her help was not needed in getting rid of Stabler. (Doc. 576, 31:6-8). Gray "felt awkward and very uncomfortable." (Doc. 576, 31:6-11).

McDickinson again asked Gray if she could trust her, but without receiving an answer, asked if she would write some school papers and McDickinson and Birchfield would pay her. (Doc. 576, 31:12-22). McDickinson said she needed the paper because she was going back to school for human resources. (Doc. 576, 31:9-17). Gray did not know, nor ask, what the topic of the paper was. (Doc. 577, 16:9-17:7). Again, Gray felt "uncomfortable" and "[a]gain, very awkward." *Id.* at 22. Gray understood that from the minute she arrived at the house, there was no prohibition against her leaving. (Doc. 577, 43:1-4).

---

[4] Betty Stabler was an LPN who worked in Safety on the first shift with whom Gray had persistent workplace conflicts. (Doc. 576, 56:19-23; 61:3-19; 155:25-157:25).

16

**Picture Taken**

Gray agreed a picture of the two women was taken while she and McDickinson were sitting in the Auburn-Alabama chairs. (Doc. 576, 40:5-24). Gray testified Birchfield took the picture and there was a light in her eye so she turned her head away as McDickinson was leaning in toward her. *Id.* McDickinson testified the picture accurately and fairly depicted Gray and her in her garage on the night of November 14, 2015 and she had sent the picture to her attorneys. (Doc. 582, 43:3-9; 44:17-18; 48:19-25; 49:15-20; 50:3-51:21, App'x. Tab 12, DX. 89). McDickinson said the face she was making in the picture was a "duck face" that females do and said she assumed Gray had a "pucker face" because Gray was kissing her on the cheek. (Doc 582, 100:14-101:15, Tab 12, DX. 89). McDickinson had not given Gray permission to kiss her but was not offended. (Doc. 582, 101:23-24:1). Jackson showed the picture to McDickinson, after the investigator asked questions about Gray's EEOC Charge, and sent it to her. (Doc. 582, 44:19-24, 104:13-3). Jackson recognized DX. 89 as a photograph of McDickinson and Gray but denied he took it because he did not remember taking it. (Doc. 584, 53:2-18). Nor did he recall Birchfield taking any pictures. (Doc 584, 107:8-12)

Gray testified McDickinson's hoodie in the picture was the one she was wearing on November 14, 2015. (Doc. 573, 65:11-15). Gray identified herself in the picture. (Doc. 573, 64:19-21). Gray questioned whether the picture had been

photoshopped or altered. (Doc. 573, 70:3-6). However, she did not present any evidence of alteration. McDickinson denied she had altered the picture. (Doc. 582, 49:4-6).

**Hand on knee**

At least 15 minutes after Gray arrived, as they conversed in the chairs, McDickinson leaned over, put her hand on Gray's knee, said she "smelled really good" and that she was attracted to her. (Docs. 576, 32:5-7; 577, 32:7-10; 35:19-22). McDickinson did not ask permission to touch her. (Doc. 577, 112:1-3). Gray's deposition testimony read in court reflected as she removed her hand Gray told McDickinson "thank you" in response to McDickinson complimenting her perfume. (Doc. 577, 49:3-4, 8-20). Gray was "very, very uncomfortable" with the hand on her knee and moved McDickinson's hand but did not leave the garage or move her chair away. (Doc. 577, 32:8-13; 19-22; 33:9-15). Gray knew that if she had gotten up and left that would have been a clear communication that she did not want that [touch] but she chose to stay. (Doc. 577, 32:23-33:3; 34:6-8). Gray told McDickinson that she was "uncomfortable." (Doc. 577, 34:15). After saying this, she looked at Birchfield but did not know if he heard what was said between them. (Doc. 579, 34:9-18). Gray did not turn to Birchfield or tell him that McDickinson was making her uncomfortable. (Doc 577, 34:19-21). There was nothing preventing Gray from getting up and walking out of the door at that time. (Doc 576, 106:3-5).

Gray then noticed and asked about a tattoo on McDickinson's "arm" that said "David'; McDickinson told Gray it was for David Birchfield. (Doc. 576, 33:18-23). McDickinson testified her tattoo says "David" but was for her father with whom she had been reconciled. (Doc. 582, 29:2-12).

**McDickinson Asks Gray to Dance**

Sometime after the explanation about the tattoo, McDickinson asked Gray if she would like to dance but Gray demurred because she does not like it. (Doc. 576, 33:24-34:1). Birchfield encouraged Gray to dance with McDickinson. (Doc. 576, 34:2-4). With no tone of anger, McDickinson said, "Come on. . . . [L]et's dance" as she grabbed Gray's hand and pulled her up to dance. (Doc. 577, 39:7-9, 40:12). With Gray's refusal, McDickinson asked Birchfield to fix Gray a drink, and Gray declined. (Doc. 577, 45:7-8).

**Birchfield and Gray kiss**

Birchfield left the table and "came behind" Gray and whispered in her ear that he had never kissed anyone with braces, and he wanted to kiss her. (Doc. 577, 45:9-11). Gray was facing McDickinson at this moment but Gray did not look at her and ask for help. (Doc. 577, 45:12-15). Gray did not ask Jackson to help her. (Doc. 577, 45:16-17). Instead, Gray turned around to face Birchfield because she was "extremely shocked, extremely stunned" that Birchfield would say that. (Doc. 577, 46:6-9). When she turned around, "his lips touched [Gray's] lips" as in "brushed"

19

hers. (Doc. 576, 34:18-20, Doc 577, 46:18-20). Gray did not slap or tell Birchfield to stop, scream, or call out for Jackson. (Doc. 577, 46:21-47:9). Gray testified at trial she did not want Birchfield to kiss her. (Doc. 576, 34:21-22).

At that moment, Gray was "sandwiched" between Birchfield and McDickinson, and McDickinson put her breasts on Gray's back and asked her to have a threesome with them. (Docs. 576, 35:5-11; 577, 46:9-10). On cross: (1) Gray denied McDickinson said anything while pressing on her back (Doc. 577, 54:2-4); and (2) admitted she had not related this request for sex when telling what happened in her deposition. (Doc. 577, 51:9-52:6). Gray "nudged" Birchfield and she moved from between them. (Doc. 577, 47:2-3, 50:13-14).

**Hand on Breast**

Then, McDickinson took Gray's hand and put it on her breast and told Gray she had had her breasts done and wanted to know if they felt real. (Docs. 576, 36:24-37:7; 577, 50:13-17[5]). Gray testified she did not want to touch McDickinson's breast but did not complain that night. (Doc. 577, 113:9-10). The described touches all happened within a matter of seconds. (Doc. 577, 54:5-6).

Feeling "very violated, very uncomfortable," Gray told McDickinson she was not interested in having sex with them. (Doc. 576, 35:12-16). McDickinson then told

---

[5] The last citation is to Gray's deposition testimony read into the record where she said McDickinson "tried" to put Gray's hand on her breast but Gray pulled it away. (Doc. 576, 50:13-17).

FP 48185123.1

Gray she had heard Gray was bi-sexual whereupon Gray did not respond but ". . . just looked at her again shocked, stunned, in disbelief." (Doc. 576, 35:21-24). Gray testified McDickinson said she could have sex with her and let Birchfield watch. (Doc. 576, 35:24-36:1). Gray did not respond. (Doc. 576, 36:2-4). She then saw McDickinson pull down Birchfield's pants, remove his penis and begin to perform oral sex but there was no invitation or effort to engage Gray in the act. (Doc. 576, 36:4-7, 11-14). At that point, Gray announced she needed the bathroom and left the garage. (Doc. 577, 56:5-14). Gray did not relate any other touching thereafter that night. Saying she barely knew Gray, McDickinson denied any touch whatever of Gray, as well as, performing oral sex. (Doc. 582, 34:24-35:3, 35:4-12).

**Jackson's account**

Gray presented Jackson's testimony about that night. After Gray arrived, Jackson does not know what was discussed, except at some point in their direct conversation, Gray told him Birchfield tried to kiss her. (Doc. 584, 30:21-24; 31:2-32:6). Jackson and Gray were sitting in chairs right next to each other when she told him about the attempted kiss. (Doc. 584, 32:7-16; 44:8-11). Jackson did not hear any request made of Gray to engage in any sex act, or attempt to get her to dance. (Doc. 584, 74:11-17). He also could not recall any time that McDickinson ever touched Gray. (Doc. 584, 74:18-22). Jackson did not see McDickinson or Birchfield force themselves on Gray. (Doc. 584, 75:7-9).

21

Jackson testified that they all "sat around talking for awhile, having a few drinks . . . . And at some point in time, Mr. Birchfield and Ms. McDickinson started to have sex – oral sex, and Ms. Gray and I sat there . . . . And I believe she said to me, you know, these people are crazy or something like that." (Doc. 584, 9:10-16). Jackson does not know the time or genesis of this event but saw them when he turned around, from where he and Gray were talking. (Doc. 584, 46:24-47:11; 76:16-20, 77:21-78:16).

**Gray Did Not Complain, Leave After Any Touching or Ask for Help**

Gray could not think of a moment where they were laughing and joking. (Doc. 577, 43:15-16). Despite finding the experience unpleasant and uncomfortable, Gray stayed at McDickinson's, house for an hour out of fear, saying "[h]uman resource invited me over, informing me they wanted to discuss some things in regard to work, and I just – I didn't leave." (Doc. 577, 23:24-24:2, 24:3-7). Gray had never been to a human resource department home for dinner or a party, so it was a "very awkward situation" for her. (Doc. 577, 44:22-24). When asked why she did not at the time act on or convey this feeling, her response was "I don't know." (Doc. 577, 44:22-45:1). However, she never told "human resource" she wanted to leave. (Doc. 577, 40:22-41:15).

Gray could not identify when she was "fearful." (Doc. 577, 25:21-26:3). Gray did not seek her supervisor's help because she did not know she could go to him.

(Doc. 577, 25:8-14). Even when Gray felt fearful sitting in the garage with McDickinson, Gray never reached out to Jackson to say she needed to leave. (Doc. 577, 27:1-3). Gray never cried in front of Jackson that night in the garage. (Doc. 577, 27:4-6).

McDickinson did not threaten Gray with being fired, and she was not threatened physically in any way. (Doc. 577, 24:20-22, 27:25-28:4). Gray said she felt threatened through their actions because "[t]hey made me feel powerless and afraid." (Doc. 577, 111:10-19). No testimony related these feelings to any specific touch. There was no yelling that night in the garage, neither Birchfield nor McDickinson used anger in their voices and no one told Gray she had to do anything. (Doc. 577, 28:13-15). Gray did not know of any prior situation where Birchfield or McDickinson had threatened anybody. (Doc. 577, 28:16-18). Nor did she know of any situation where Birchfield or McDickinson had insisted someone have sex with them. (Doc. 577, 28:19-22).

Gray did not seek Jackson's help to leave the house but acknowledges she could have. (Doc. 577, 36:4-7, 36:16-18). Gray's back was to the garage door and while she knew there was a door that went into the house, did not recall the door to the backyard. (Doc 577, 37:7-17) Gray was not looking for a door. (Doc. 577, 37:18-20).

23

**Gray Finally Decided To Leave**

Gray testified she felt "powerless, humiliated, degraded, horrible." (Doc. 577, 113:13-14). Upon her return from the restroom to the garage, the overhead light was on and the strobe had been turned off. (Docs. 576, 38:17-21; 577, 31:23-32:1). Gray went to her car followed by Jackson. (Doc. 577, 61:5-6). Gray asked Jackson: "What are you doing with these crazy people?" (Doc. 577, 61:2-7). McDickinson went to the car asking her to stay and Birchfield came out of the front door of the house in his underwear. (Doc. 577, 61:7-9). Gray drove to her girlfriend's mother's house to talk to her girlfriend, Dakota. (Doc. 576, 39:16-20).

Jackson testified that after that night, Gray said she was uncomfortable with the oral sex. (Doc. 584, 10:11-19). The day after the party, Birchfield sent a text to Jackson asking how Gray felt about the night before and Jackson told Birchfield he believed "she was okay with it." (Doc. 584, 11:11-16). He had several conversations with her after that night about going to McDickinson's and sometimes she would say "yes" and others "no," but she never did. (Doc. 584, 11:5-10).

**Touching in the Office**

McDickinson's and Gray's work schedules did not overlap except for about 30 minutes and when McDickinson would work late. (Doc. 582, 72:14-17). A week or so after November 14, Gray testified McDickinson called her to her office. (Docs. 576, 51:9-15; 577, 76:24-77:2). She was afraid. (Doc. 576, 52:15-18). When she

24

went into the office, McDickinson was sitting behind her desk wearing a white blouse that was unbuttoned. (Doc. 576, 12-15). The door was closed but there was a small window in the door but it was away from the desk. (Doc. 576, 51:16-24). McDickinson testified the office window had open blinds. (Doc. 582, 122:15-24). McDickinson told Gray she had a sunburn and wanted her to look at it but it was on her breasts. (Doc. 576, 51:25-52:1-2). Gray did not see the sunburn. (Doc. 577, 77:3-5). Gray testified she left the office and went to the bullpen. (Doc 576, 52:3-4).

When her lawyer asked if there was any touching, Gray said before she left the office, "she came up to me and put her breasts on me." (Doc. 576, 52:5-10). Gray did not back up as McDickinson approached her because it "happened so fast" but told McDickinson she was not interested in her and turned and left. (Doc. 577, 77:9-16). She did not make a report. There was no claim of further touching by McDickinson.

**Gray to report to McDickinson at work**

In March 2016, Gray sent her supervisor, with a copy to Birchfield and McDickinson, an email complaining about harassment from her supervisor and Stabler. (Doc. 576, 150:12-25, Doc. 503:98, DX. 131). Gray requested a meeting with them to discuss her complaint. (Doc. 576, 161:18-20). The three met on March 21, 2016 and the meeting was recorded. (Doc. 576, 165:17-25, 166:1-13, Doc. 503:144-DX. 244 – audio recording). Birchfield had gotten in the habit of recording

FP 48185123.1

meetings due to the amount of information prohibiting the taking of accurate notes. (Doc. 579, 32:15-22). The recorder was placed in front of the employee. (Doc. 579, 32:23-25).

Birchfield thinks Elrod made the suggestion for medical [personnel] to thereafter report to HR. (Doc. 579, 83:11-16). Birchfield made the suggestion in the meeting, which surprised McDickinson who did not want the added report. (Doc. 579, 33:15-25). Gray agreed to the suggestion that she would report to McDickinson and the change was made. (Doc. 576, 176:2-21). After several attendance infractions, McDickinson issued Gray a Memorandum of Understanding dated April 14, 2016, which Gray agreed was appropriately issued but was still upset. (Doc. 576, 64:15 – 65:1-25, 183:17-23, Doc. 503:115, DX. 167). The same day, Gray filed the EEOC Charge for the first time alerting McDickinson or Koch Foods she was offended by the alleged touches on November 14, 2015. (Doc. 576, 107:12 – 108:2, 182:21 – 183:1; Doc. 503:131, DX. 202). Gray voluntarily resigned April 29, 2016. (Doc. 576, 203:20 – 204:7; Doc. 503:126, DX. 189).

## SUMMARY OF THE ARGUMENT

The evidence of the elements of assault and battery, punitive damages and prevailing party were not met. The flirtatious touches occurring in a private home, in a party atmosphere at midnight on a Saturday night, were not shown by substantial evidence to be intentionally harmful or offensive. Nor did Gray's facts find legal

26

support from workplace cases alleging sexual harassment, or touching with sexual overtones, except to the extent of the general obligation of a victim to object, protest or report. Gray could have but did not avoid the invitation by working her entire shift that night. An employee must stay at work in furtherance of a bargained for exchange that does not *ipso facto* co-exist with a voluntary appearance at a party in a private home, even among co-workers.

After a brief discussion of trivial workplace topics, Gray was on notice of McDickinson's personal interest from her hand on Gray's knee. For approximately 45 minutes more, Gray engaged in or observed conversation as the rap music continued playing. Gray admitted the photograph showed her tolerate physical closeness to McDickinson that night. Gray's reactions that night must inform her perception and experience at the time, undermining the post-litigation claims of "powerlessness," and feeling a "loss of control."

Gray's objection was directed to dancing, not McDickinson touching her. Denying any anger or harm from the flirtatious touches, Gray chose not to leave, nor utter a word of protest about being touched, except saying she was "uncomfortable" after the hand on her knee and at the end announcing disinterest in having sex.

Gray did not have evidence that Birchfield's lips intentionally brushed hers as she suddenly turned to face him after he said he wanted to kiss her. There was insufficient evidence from which a reasonable jury could infer that at the time, Gray

27

found the lips touch unwelcome in the context of a battery. Nor did the evidence allow a reasonable inference Birchfield knew McDickinson would or was pressing on her back when she was between them. Despite the district court's unsupported inference, Gray did not testify that Birchfield pressed on her back when she said they "sandwiched" her.

The evidence failed to show why she did not leave, protest a touch, or seek Jackson's help, thereby undermining her claims of offensiveness, or wantonness. Indeed, her first such complaint was five months later in an EEOC Charge, following her consent to reassignment of supervision to McDickinson and a reprimand for attendance violations. A victim's complaints or protests at the time of an alleged touching provide the only evidence a factfinder can reasonably use as evidence the touch was offensive. At most any protest by Gray was of an off-hand nature, defying hostility and offensiveness, leaving a factfinder to speculate on what their own response might have been. Appellants' negative defenses did not allow an inference Gray met the burdens both for assault and battery and punitive damages. She met neither.

Appellants' actions in those early morning hours do not reflect they were taken carefully, consciously or purposefully. Moreover, beyond her benign reactions, Gray did not testify to Appellants threatening, yelling, speaking in a sharp tone or other actions which could reasonably be interpreted as actions of

FP 48185123.1

particularized circumstances of aggravation or insult. The district court's cursory analysis of the evidence supporting punitive damages relied on the same erroneous facts used to support assault and battery and failed to identify any which allowed a reasonable jury to find wantonness, malice or oppression.

Gray was not a prevailing party for purposes of obtaining an award of costs. In order to prevent the admission of Rule 404b testimony, Appellants dismissed the counterclaims with prejudice prior to trial in a win for Gray and reduced her burden to defend at trial. Gray suffered no prejudice from the dismissals. With the wins on assault and battery, Gray prevailed on four claims and Appellants' prevailed on four. The district court's Order did not distinguish the holding in *Royal Palm Props., LLC v. Pink Palm Prop., LLC,* 38 F. 4th 1372, 1376 (11th Cir. 2022) which is controlling here. The designation of Gray as a prevailing party, along with the verdicts of assault and battery and punitive damages are due to be reversed and rendered.

## ARGUMENT

## I. LACK OF SUFFICIENT EVIDENCE OF ASSAULT AND BATTERY

Appellants contend Gray's testimony failed to show she was touched with either a hostile manner or spirit and with an intention to harm or offend. The district court erred in sustaining the verdicts for assault and battery. This Court reviews the denial of the Renewed Rule 50(b) motion *de novo* and the jury's findings are not

29

pertinent to the inquiry. *See Chaney v. City of Orlando,* 483 F. 3d 1221, 1228 (11th Cir. 2007).

### A. Relevant Case Law

#### 1. Alabama Law on Assault and Battery

The elements of an assault and battery are: "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Harper v. Winston County,* 892 So. 2d 346, 353 (Ala. 2004) quoting *Atmore Cmty. Hsp.,* 719 So. 2d 1190, 1193 (Ala. 1998) (omitting citations therein). The *Atmore Cmty. Hsp* opinion cited to *Surrency v. Harbison,* 489 So. 2d 1097, 1104 (Ala. 1986) and Restatement (Second) of Torts § 18 (1965) which defines liability for battery where: "(1) he acts intending to cause a harmful or offensive contact with the person of the other or a third person or an imminent apprehension of such a contact and (2) an offensive contact with the person of the other directly or indirectly results." The wrong arises from "the manner or spirit" in which the act occurred, so that a battery requires some touching with hostility. *Surrency,* 489 So. 2d at 1100 *quoting Singer Sewing Machine Co. v. Methvin,* 184 Ala. 554, 561, 63 So. 997, 1000 (1913) *quoting in turn* T. M. Cooley, The Elements of Torts, [Callaghan and Company, Chicago 1895].

In *Atmore Cmty. Hsp.,* 719 So. 2d at 1194 the court noted when Turner complained about her supervisor poking near her armpits and breasts area, and

30

rubbing against her in the hall, the touching stopped. *Id.* at 1193. In the context of workplace claims, the court found those unwelcome touchings with sexual overtones constituted a battery. *See Stancombe v. New Process Steel, LP,* No. 2:13-cv-1134 *17 (N.D. Ala. 2015)(interpreting *Atmore Cmty. Hsp.*, as allowing claim for assault and battery to proceed in the sexual harassment context where intentional touchings were conducted with sexual overtones and were unwelcome)

    2.    <u>Legal Burden of Proof and Rule 50(b) Review</u>

Gray was required to show, by substantial evidence, proof of each element of the claims of assault and battery. *See Celotex Corp. v. Cathrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ([F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.,* 5 F. 4th 1235, 1242 (11th Cir. 2021) (Rule 50 motion granted "only when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for [it] on a material element of [its] cause of action.'..."); *Anderson v. Liberty Lobby,* 477 U.S. 242, 249-250, (1986) (merely colorable, or evidence not significantly probative will not be sufficient to avoid summary judgment.)

The Rule 50 motion review ". . . must disregard all evidence favorable to the moving party that the jury is not required to believe . . . ." and ". . . give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the

FP 48185123.1

moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed 2d 105 (2000) citing 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, pp. 299-300 (2d ed. 1995).

**B.     Actions By Appellants and the Manner and Spirit In Which They Took Place Do Not Amount To Assault and Battery**

After being invited into the dimly-lit garage, with rap music playing and drinking taking place, Gray took a chair right next to McDickinson, who she barely knew. Despite McDickinson placing her hand on her knee and saying she was attracted to her within about the first fifteen minutes, Gray remained about an hour and was prompted to leave, not by a touch to her person but by the act between Appellants.

1.     Gray's Evidence Does Not Show McDickinson Intended Harm

Gray denied any angry words or gestures were directed toward her at any time she was McDickinson's guest. The photograph of the two while they were seated shows Gray, with eyes closed, leaning in toward McDickinson. (App'x. Tab 12) She explained the flash made her close her eyes. The physical closeness she tolerated is unmistakable. Gray could not dispute that Jackson had told McDickinson that Gray was interested in her or that he told Gray that McDickinson had an interest in her. Lacking any tone of hostility or insult with any touch, Gray described flirtatious

32

touchings in a private home by McDickinson she claimed months later in an EEOC Charge were assault and battery. The complaint coincided with disappointment over a personnel reprimand.

(a)    Touch to the Knee

Even though Gray testified she would not have gone to McDickinson's home except to talk about work issues, after some trivial work-related items were discussed, Gray did not leave. When McDickinson placed her hand on Gray's knee with expressions of personal interest, Gray took McDickinson's hand and returned it. She did not warn McDickinson not to touch her. Gray testified she said she was "uncomfortable." Gray was not so offended, nor uncomfortable with McDickinson that she moved her chair away to allow more space between them, or left.

(b)    Dance Request

During her conversation with McDickinson, the music was playing. (Doc. 577, 22:2-4). Based on Gray's testimony, it was after one in the morning when the off-hand request to dance was made. (Doc. 577, 43:5-8). Alcohol was consumed by participants, other than Gray, before and after her arrival yet she could not testify if she considered it was a party. (Doc. 576, 104:15-25). Gray's reaction was about her not dancing, not a protest about being touched. There cannot be a battery without offensive or harmful conduct. *See Harper,* 892 So. 2d at 353 holding an actual injury to the body is not required but the manner and spirit in which the act is done informs

33

the harm. Harper resisted the effort to be redirected by the tug on her arm, yet Gray did not resist, pull away or warn McDickinson not to touch her. Likewise, the actions held to be a jury question for battery in *Surrency*,[6] are in contradistinction to Gray's lack of protest to harmless touching and freely remaining at the gathering. For instance, Gray was not so powerless she felt she had to try to dance. Her reactions, by any logical inference, reflect toleration at party flirtations. McDickinson did not try to force Gray to dance but asked Birchfield to get Gray a drink - Gray declined. (Doc. 577, 45:2-11).

(c)    Pressing the Back – Brush with Birchfield's Lips

However, during the next several seconds the brush with Birchfield's lips, McDickinson's breasts on her back and request to have sex occurred. For the first time that night, Gray said "no" when she refused sex and still did not protest any touch. (Doc. 576, 35:5-16). Gray testified she felt "very violated, very uncomfortable." She did not voice those feelings even as she was unafraid to and clearly declined the invitation for sex. *See Murdoch v. Medjet Assistance, LLC,* 294 F. Supp. 3d 1242, 1276 (N. D. Ala. 2018)( supervisor's admitted "full-body hugs," kisses and elbow tug not prevented or objected to by plaintiff so no evidence she found unwelcome resulting in dismissal). She moved only a few feet away, ending

---

[6] 489 So. 2d at 1104 co-worker Bowman ". . . knocked his hand off the door, shoved Harbison against the wall, and said 'you're not going anywhere' [;]" leaning on Surrency and bumping his chest against him; cursing Harbison; and shoving him with such force he spilled his coffee.

34

the seconds of being between them. She still stayed. Even when McDickinson confessed she had heard Gray was bisexual, Gray did not respond, reprimand her or leave.

(d) Lips Touch

Gray's description of the brushing of the lips with Birchfield asked the jury to infer it was intentional because Birchfield had expressed a desire to kiss her. However, it was Gray who turned to face him and not Birchfield touching and turning her around. Gray merely nudged Birchfield to show rejection and he immediately backed away. This was not sufficient evidence for a reasonable jury to infer Birchfield intentionally brushed Gray's lips.

Gray's lack of verbal protest at the time of the statement, turning to face Birchfield, and failing to make a complaint, reasonably infer consent, acceptance, annoyance or toleration but not an offensive or unwelcome touching. In significant contrast is *Wilborn v. Southern Union State Cmty. Coll. et al.,* 720 F. Supp. 2d 1274, 1288 (M.D. Ala. 2010) where with repeated humiliating touches, the victim continued to complain *and Simmons v. Frank Norton, LLC,* No. 2:15-cv-00147 * 4 (N.D. Ala. July 27, 2017) where plaintiff was overheard telling the harasser "you need to stop, this isn't right, I don't appreciate it." Even Ms. Harper understood her complaint, following the supervisor grabbing her arm, was evidence she was offended. *See Harper,* 892 So. 2d at 354. Gray's passive statement of being

FP 48185123.1

"uncomfortable" to McDickinson's hand touch, or disinterested in sex, yet remaining in the garage, do not amount to pointed protests. Only her actions at the time could have informed any legally unwelcome or offensive behavior. The conflict in her saying she was "uncomfortable" and "I didn't leave," defy sufficient evidence of an assault or battery. This existential principle was succinctly stated by Ralph Waldo Emerson in an essay titled "Social Aims" saying "[w]hat you do speaks so loud[ly], that I cannot hear what you say." Emerson, Collected Works of Ralph Waldo Emerson, Vol. VIII – Letters and Social Aims," (Houghton, Mifflin & Co., 1875) The context was his urging readers to be authentic and sincere.

Sitting across the table from Birchfield for close to an hour, there were no conversations or actions which motivated Gray to leave, nor any action or word she expressed to lead Birchfield to believe she was ill-at-ease or not enjoying the small party. Moreover, Gray, college-educated and a registered nurse, did not, as a reasonable person would have done, make any complaints immediately following that night, or for months to Jackson or her supervisor about being touched in a rude, offensive or unwelcome manner. *See Murdoch,* 294 F. Supp. 3d at 1276. On cross-examination, Gray was confronted with her deposition testimony and admitted her rendition of events there omitted requests for sex. (Doc. 577, 50:4-17). Her evidentiary contradictions would continue to undermine the sufficiency of the evidence required to sustain the verdict.

FP 48185123.1

### (e) Taking Gray's Hand to Her Breasts

The two versions of the hand on the breast testimony both begin with McDickinson's admission she had had "her breasts done" and wanted to know if Gray thought they were real. *Compare* Doc. 577, 50:13-17 (attempted to touch breasts) *with* Doc. 576, 36:24 – 37:7 (her hand touched the breasts). Gray admitted the allegation was not in her EEOC Charge. (Doc. 576, 110:13-16). Gray denied any anger in McDickinson's tone, nor a touch in a hostile manner. The district court improperly supplied the menacing tone and aggression Gray denied. (App'x Tab 19, pp. 3-4).

The few touches by McDickinson during the late- night drinking party were flirtatious but did not demonstrate, in the circumstances and by Gray's admitted actions, an intention to harm or humiliate. Cases of assault and battery, arising in the workplace, do not apply to the private party in this case, except as they speak to the victim's obligation to protest and/or complain. *See, e.g., Harper,* 892 So. 2d 348; *Atmore Cmty. Hsp.,* 719 So. 2d at 1194; *Zavala v. Sexton, et al.,* No. 2:17-cv-02168 \*\*12, 27 (N.D. Ala. Sept. 5, 2019)(co-employee twice grabbed hips of plaintiff and hunched hard on outside of clothes); *Young v. AlaTrade Foods, LLC,* No. 2:18-cv-00455 \*\*26-7 (N.D. Ala. Sept. 6, 2019) (repeated comments, requests for sex and touches plaintiff said were not welcome); *see, Wilborn v. Southern Union State Cmty. Coll. et al.,* 720 F. Supp. 2d 1274, 1310 (M.D. Ala. 2010) where trainer

37

FP 48185123.1

"popped her on the butt at least twice (once while remarking how 'sweet smelling' she was), pulled her pants out to expose her panties, and lifted her shirt up and touched her back" along with sex-based statements such as "there is nothing wrong with a little pussy" and she repeatedly turned or walked away to indicate the actions were unwelcome.

(f)     Office Touch

Gray testified the office door was closed. From her testimony it is plain, she would have had to close it when she came into the office and saw McDickinson behind the desk with her shirt unbuttoned. This evidence undermines her testimony of feeling fearful. The brushing of the breasts was not attended with any tone of anger or hostility, nor requests for sex so McDickinson's intent can only be guessed at. *See Surrency,* 489 So. 2d at 1104 noting an actionable battery does not arise in a harmless or accidental touch. (citations omitted) Gray did not claim offense but casually interpreted the touch as a pass she freely rejected. She did not make a report. Contrasted with that scenario is Ms. Geeslin's inability to overcome the power inequality with her supervisor at work who she had befriended and palled around with on a non-business basis and tolerated sexually charged mistreatment at work until she reported him and he was fired. *See Geeslin v. Morrison Mgmt., Specialists, Inc., et al,* No. 2:06-cv-410, 2007 WL 9711634 **5-7 (N.D. Ala. 2007).

FP 48185123.1

<u>Gray's Evidence Does Not Show Touches Were Offensive</u>

In the seconds that transpired when Gray was between them, Gray said nothing to McDickinson when Birchfield asked for a kiss, to Birchfield when their lips brushed, or to McDickinson while pressing her back, or grabbing her hand. Gray asks the court to ignore what she said, did and did not do in reaction to the touches at the time. There is no evidence Gray was compelled to remain at the garage so she tolerated touches in the spirit of a party. She does not know why she did not complain at the time to any touch. Her choice to remain in the garage and not state a pointed protest to any touch cannot allow a factfinder to simply infer it must have been offensive. Gray was required to take action equivalent to any threat in order to meet the standard of substantial evidence that she was offended or perceived the touch to be harmful. Gray's actions of protest at the time, point to acceptance or toleration. In significant contrast is *Wilborn,* 720 F. Supp. 2d at 1288 where with repeated touchings, the victim continued to complain *and Simmons v. Frank Norton, LLC,* No. 2:-cv-00147 *4 (N.D. Ala. July 27, 2017)(where plaintiff told the harasser "you need to stop, this isn't right, I don't appreciate it." *See Simmons v. Mobile Infirmary Medical Center,* 391 F. Supp. 2d 1124, 1130 (S.D. Ala. 2005) holding failure to complain at the time of occurrence reflects she did not "perceive the conduct as offensive at the time," citing *Paraohao v. Banker's Club, Inc.,* 225 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002) quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68, 106

FP 48185123.1

S. Ct. 2399, 91 L.Ed.2d 49 (1986): "The correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained] – of behavior] was unwelcome."[7]

When Gray plainly rejected the flirtatious actions, there was no further contact. McDickinson's belief Gray was bisexual reasonably infers flirting, not hostility. She told Jackson that Birchfield tried to kiss her but not as a complaint and never at the time complained of fear, or being touched, either when he walked her to her car, or in the numerous text exchanges that continued for months after.

The district court asserted Gray complained repeatedly, which is not supported by Gray saying she was "uncomfortable," nudging Birchfield and finally saying "no" to sex, which ended any touch. If "no" means "no," it has to be stated. Gray's attempt post-litigation to re-interpret the actions from tolerant or annoying to hostile or insulting cannot be what the Court intended in *Anderson,* 477 U.S. at 255 directing that an inquiry with all justifiable inferences be taken in favor of the party's evidence. Gray presented substantial conflict in <u>her</u> <u>evidence</u> for jury resolution which Appellants contend defies sufficient evidence from which a reasonable jury could find them guilty of assault and battery.

The district court mentioned the oral sex act in the Order. (App'x. Tab 19, p. 4). No matter how heinous, this was not an assault or battery. Yet, that event was

---

[7] These cases arising in a workplace setting are cited for the principle that a claimant must alert another that their actions are perceived as harmful or offensive which applies here due to Gray's remaining at the party.

FP 48185123.1

what Gray testified caused her to feel frozen with "so many emotions" including shock and disgust, even as she was not touched. (Doc. 576, 36:8-10).

The record does not support Gray's claim she objected to being touched at the time, as opposed to refusing to accept a further touch from Birchfield. A college graduate and subject to another's supervision, Gray did not demonstrate any touch was offensive by leaving. By her own telling, she left in disgust, not with intimidation or humiliation. No reasonable jury, untainted by passion or other immaterial testimony, could find actions of McDickinson, in the circumstances, amounted to an assault and battery.

## II. LACK OF SUFFICIENT EVIDENCE TO SUSTAIN PUNITIVE DAMAGES VERDICT

Arguments on assault and battery are incorporated here. This Court reviews the sufficiency of the evidence of punitive damages *de novo*. *See Chaney,* 483 F. 3d at 1227. The district court relied upon a cursory and flawed analysis of Gray's facts and evidentiary burdens to find sufficient evidence to sustain the punitive damages verdict. (App'x. Tab 19, pp. 5-6)("the Order"). The flirtatious touches described by Gray, along with her reactions, at a late night private party, did not demonstrate they were deliberately, consciously, wantonly taken, or intended to harm so as to support awards of punitive damages.

41

## A. Applicable Law

### 1. Alabama Law on Punitive Damages

Punitive damages are not available in Alabama except in wrongful death cases or tort actions where clear and convincing evidence shows a defendant "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Section 6-11-20(a), Ala. Code. The definition of "clear and convincing evidence" can only be found "when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each element of the claim and a high probability as to the correctness of the conclusion." Section 6-11-20(b)(4), Ala. Code; *see Anderson,* 477 U. S. at 255 explaining the trial judge in ruling on a dispositive motion must consider whether a reasonable jury could find malice by clear and convincing evidence, *and Senn v. Alabama Gas Corp.,* 619 So. 2d 1320, 1324 (Ala. 1993) ("clear and convincing" and not "substantial" evidentiary standard applies under § 6-11-20(a)). In *Surrency* the court held punitive damages for assault and battery are available where the "acts complained of were committed with malice, willfulness, or wanton and reckless disregard of the rights of others." 489 So. 2d at 1105-06. Claims of assault and battery, additionally require evidence of accompanying ". . . particularized circumstances of aggravation or insult." *Peete v. Blackwell*, 504 So. 2d 222, 223 (Ala. 1986) quoting *John R. Thompson & Co. v.*

FP 48185123.1

*Vildibill*, 211 Ala. 199, 202, 100 So. 139, 141 (1924) and *citing Surrency,* 489 So. 2d at 1105-06.

2.     Evaluation of Punitive Damages Claim and Verdict

This Court must apply the clear and convincing evidence standard the district court should have used. *See Abel v. Dubberly,* 210 F. 3d 1334, 1337 (11th Cir. 2000)(employing same standard as the district court). A verdict "must" be directed by the trial judge where "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson,* 477 U.S. at 250, citing *Brady v. Southern R. Co.,* 320 U.S. 476, 479-480, 64 S. Ct. 232, 234, 88 L. Ed 239 (1943).  However, it is well-settled that if there is any evidence that a jury can properly credit ". . . to find a verdict for the party producing it, upon whom the *onus* of proof is imposed," a verdict should not be directed. *Anderson,* 477 U.S. 251. (citations omitted)(emphasis in the original); *see also Cheshire v. Putnam,*54 So. 3d 336, 340 (Ala. 2010) citing *American National Fire Insurance Co. v. Hughes,*624 So. 2d 1362, 1366 (Ala. 1993)(requiring clear and convincing evidence to sustain punitive damages verdict).

The district court's decision to deny the Rule 50(b) motion regarding punitive damages (App'x Tab 19, p. 6) was motivated in part by a refusal to usurp the role of the jury in contradistinction to this Court's holding in *Chaney v. City of Orlando,* 483 F. 3d 1221, 1227-28 (11th Cir. 2007) pointing out the jury findings supporting

FP 48185123.1

probable cause did not replace the burden to provide evidence of probable cause from which a jury could make such a finding.

**B.**     **Gray Failed To Show Any actions of Appellants Warranted Awards of Punitive Damages**

Punitive damages may not be awarded in every case. *See Coca-Cola Bottling Co. United v. Stripling,* 622 So. 2d 882, 884-85 (Ala. 1993), a products liability case, citing *Lynn Strickland Sales & Serv., Inc. v. Aero-Lane Fabricators, Inc.,* 510 So. 2d 142, 145 (Ala. 1987) stating ". . . wantonness is not to be confused with negligence." Even if Gray presented enough evidence to sustain verdicts of assault and battery, there were no facts supporting the higher requirement to show by clear and convincing evidence aggravating circumstances attending any touch.

### 1.     No Particularized Circumstances of Aggravation

Gray's actions, if not reflecting consent to some harmless, even if surprising, touching by Appellants, certainly fail to show the level of aggravated touching contemplated by *Peete, Surrency* and *Berry* for an award of punitive damages. Gray did not reprimand, scream, shout, slap or leave in response to any touch – she said she was not interested in response to the invitation for sex and was left alone. Nevertheless, the district court incorrectly referred to "repeated physical and verbal protests" as a reason for upholding the punitive damages verdict.  (App'x. Tab 19, p. 5).

FP 48185123.1

If Gray was not consenting to face Birchfield to receive a kiss, while feeling so extreme, she reasonably was turning to confront him. But she did not slap him, reprimand him or seek out Jackson's help. Gray's actions and inactions fairly inform and only support her perception that the situation was not egregious or vexing but at the most, annoying. Gray asks to be relieved of her duty to voice objections at the small party in a private home to Birchfield's statement. This should not be allowed.

The inconsistency between Gray's trial and deposition testimony about a request for sex being made does not allow a reasonable jury to infer she was offended or humiliated. *See, e.g., Delchamps, Inc. v. Morgan,* where the assault, battery and punitive damages verdicts were reversed for lack of evidence of insult or aggravation where the store manager took plaintiff's arm, leading her to the back of the store and said "[y]ou are going with me, you stole the cigarettes." 601 So. 2d 442, 444 (Ala.1992) citing *Peete,* 504 So. 2d at 223; *see also, Ex parte Norwood Hodges Motor Co.,* 680 So.2d 245, 249 (Ala.1996)(fraud case); *Hines v. Riverside Chevrolet-Olds, Inc.,* 655 So. 2d 909, 925 (Ala. 1994)(fraud case). Likewise, allegations about grabbing and putting Gray's hand on McDickinson's breasts to see if they felt real were not included in the EEOC Charge or testified to in her deposition. Testimony surrounding facts purportedly supporting punitive damages cannot arise in their contradictions to clear and convincing evidence of "particularized circumstances of aggravation" in perpetrating a battery.

The breast touching in the office also does not meet the requirements in *Peete,* 504 So. 2d at 223. If McDickinson's shirt was unbuttoned all the way down, Gray had the option not to close the door and/or immediately withdraw. However, she remained, standing pat as McDickinson approached. Without evidence, for instance, in some aggressive statement from McDickinson, request for sex or biting insult of Gray, attending the brushing of the breasts, there is no clear and convincing evidence the touching was deliberately and consciously done. *See Berry v. Fite,* 590 So. 2d 884, 885 (Ala. 1991) defining "conscious" as "perceiving, apprehending, or noticing with a degree of controlled thought or observation; capable of or marked by thought, will, design, or perception;" and "deliberate" is generally recognized as a slow, considered, thoughtful manner. (citations omitted).

Gray's inactions to upbraid McDickinson, tell her not to touch, nor making a report of any kind, defy an award of punitive damages. There was no analysis of Gray's evidence of protest or how the actions, taking place in a matter of seconds, amounted to evidence of conscious or deliberate actions attended with "particularized circumstances of aggravation." Moreover, the district court's reliance on "Gray's testimony concerning the overall events of that evening, . . ." and "other evidence presented at trial" make plain more than the evidence of touchings, of which she complained, were credited in the decision. (App'x. Tab 19, pp. 5-6). The Order referred to the anti-social oral sex act without noting it did not

46

involve a touch of Gray, or that it had the distinct propensity to inflame the jury to award punitive damages.

Neither the facts, nor context in *Peete* are sufficiently similar to attribute persuasive authority. The court noted the jury could have found Dr. Peete insulted the nurse prior to striking her, or that ". . . Dr. Peete cursed frequently throughout the events leading up to the incident, that he had been 'yelling and hollering' earlier in the morning, and that he threw or slammed a patient's chart across a desk some time prior to the striking." *Peete*, 504 So. 2d at 224. The court held Dr. Peete's direction to the nurse to "turn on the goddamn suction" was not an insult to her but provided the "aggravating circumstances" of angry and intimidating behavior which accompanied the assault and battery. *Id.* Likewise in *Harrison v. Mitchell,* 391 So. 2d 1038, 1040 (Ala. Civ. App. 1980), the court upheld the punitive damages award because insulting language accompanied the assault where ". . . the defendant pointed a shotgun at the plaintiff and said 'You sorry son-of-a-bitch, I'll kill you right now.'" On the otherhand, Gray's facts reflect a late night private party setting with flirtatious actions she did not plainly reject util she said "no" to having sex and any contact had ended.

2. Negative Defense Cannot Satisfy Gray's Burden of Proof

The jury's disbelief of Appellants' testimonial denials does not provide the proof of clear and convincing evidence of wantonness, maliciousness or insult and

aggravation to support punitive damages. *See Smith v. Metro. Sec. Servs., Inc.*, No. 12-cv-12711 ** 11-12 (11th Cir. Sept. 18, 2013) citing *Bose Corp. v. Consumers Union of the U.S., Inc.*, 466 U. S. 485, 512, 104 S. Ct. 1949, 1966 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."). The burden remained with Gray to provide clear and convincing proof which is not found in McDickinson's or Birchfield's credibility, nor viable with her failure to make a timely report. In response to a negative defense[8] the justifiable inferences necessary for a determination of the sufficiency of proof should not leave the jury to decide which story of the claimant's to believe. A conflict or contradiction in Gray's evidence does not provide clear and convincing evidence for a reasonable jury to award punitive damages.

## III.  DISTRICT COURT ERRED TO REVERSAL IN AWARD OF COSTS TO GRAY

The district court was wrong to find Gray was a prevailing party supporting taxation of costs against Appellants because of the dismissals of the slander per se counterclaims with prejudice.[9] This Court conducts a *de novo* review to determine

---

[8] A "negative defense" is one where the defendant denies what the plaintiff says occurred without attempts at excuse or affirmative defense from liability. *See Atmore Cmty. Hsp.,* 719 So. 2d at 1193, n. 1 explaining that a "negative defense" is one which refutes an essential element of a plaintiff's claim.

[9] No specific amount of costs has been determined so the issue here solely addresses the designation of Gray as a prevailing party with a *de novo* standard.

the question of prevailing party. *See Beach Blitz Co. v. City of Elizabeth,* 13 F. 4th 1289, 1297 (11th Cir. 2021).

### A. Gray Was Not A Prevailing Party Entitled to Costs

#### 1. Relevant Law

When a party prevails at trial, there is a presumption that costs will be allowed; if the court determines otherwise the reason must have a sound basis and be explained. *Chapman v. A-1 Transport,* 229 F. 3d 1012, 1038-39 (11th Cir. 2000); *McKitt v. Ala. Bev. Control Board,* 2:12-cv-673 * 2 (M.D. Ala. Nov. 26, 2013); Rule 54(d), Fed. R. Civ. P. Under Rule 54(d), Fed. R. Civ. P. there can be only one prevailing party.

The "prevailing party" is a legal term of art. *See Buckhannon Board & Care Home v. West Va. Dep't. Health & Human Services*, 532 U.S. 598, 603, 121 S. Ct. 1835, 149 L.Ed2d 855 (2001)(Congress used the term "prevailing party" in defining those parties entitled to litigation costs). In order to be accorded "prevailing party" status, a party must have obtained some relief from the court (*Buckhannon*, 532 U.S. at 603) "'which changes the legal relationship' between the parties.'" *Royal Palm Props LLC v. Pink Palm Prop. LLC,* 38 F. 4th 1372, 1376 (11th Cir. 2022) quoting *Tex. State Teachers Ass'n v. Garland,* 489 U.S. 782, 792-93 (1989). The definition is the same whether considering attorney's fees or cost awards. *Royal Palm*, 38 F. 4th at 1377 citing *CRST Van Expedited, Inc. v. Equal Employment Opportunity*

FP 48185123.1

*Commission,* 578 U.S. 419, 422, 136 S. Ct. 1632, 1646,194 L. Ed 2d 707 (2016) (the Court's approach is to interpret the term appearing in various fee-shifting statutes consistently). *See Dattner,* 458 F. 3d at 101, citing *Farrar v. Hobby,* 506 U.S. 103, 119-120, 113 S. Ct. 566, 121 L. Ed.2d 494 (1992)(O'Connor, J., concurring and suggesting the prevailing party standards for 42 U.S.C. § 1988 and Rule 54(d) are synonymous); *accord Tunison v. Continental Airlines Corp., Inc.,* 162 F. 3d 1187, 1189-90 (D.C. Cir. 1998).

In finding no party prevailed, the district court in *Royal Palm* considered all of the claims and their disposition in deciding which of the two parties to the litigation was the "prevailing party," and this Court affirmed. 38 F. 4th at 1377, 1382. The basis of the opinion was the reasoning of the Eight Circuit holding in *East Iowa Plastics, Inc. v. PI, Inc.,* 832 F. 3d 899, 907 (8th Cir. 2016) which found there was no prevailing party where the parties "achieve[d] a dead heat." *See Royal Palm,* 38 F. 4th at 1379, holding: "When the parties achieve a 'tie,' a district court may find no prevailing party for purposes of costs and fees." The rule is permissive where there is a tie but there must be a reasonable explanation by the court for departing from the rule. *See Chapman v. A-1 Transport,* 229 F. 3d at 1039.

2. <u>Designation of Gray as Prevailing Party Was Error Warranting Reversal</u>

The district court's failure to address the claims submitted to the jury in designating Gray a prevailing party was error. Appellants' objections noted they and

Gray equally prevailed on four (4) claims. (Doc. 424, pp. 2-6). Gray failed to respond to any objections. *See Kidd v. Mando Am. Corp.,* 870 F. Supp. 2d 1297, 1299 (M.D. Ala. 2012) ("After the [opposing party] objects, the onus is on the [party seeking costs] to articulate why the [opposing party's] objection fails."); *accord, Smith v. The Attorney General State of Alabama,* 2:17-cv-297 RAH * 3 (M. D. Ala. Oct. 6, 2020).

By way of a footnote reference, the district court relied upon a finding that Birchfield was a prevailing party in the case of *Vinson v. Koch Foods of Ala., LLC,* No. 2:12-cv-1088-ECM-SRW, 2019 WL 6971497, at * 1 (M. D. Ala. Jan. 29, 2019) (*see* App'x. Tab 20, n.1). In declaring "what is good for the goose is good for the gander[,]" the district court's superficial comparison of the cases did not support an award of costs to Gray on any claim. First, Birchfield was dismissed as a <u>party</u> with prejudice before the imposition of costs. However, here, Appellants only dismissed their counterclaims with prejudice so Gray prevailed. She remained a party going to trial, with at least 11 claims, all of which were ultimately submitted to the jury.

Secondly, the Vinson matter is distinguishable for lack of comparative reasons for seeking dismissal, which the district court did not consider. (*see* App'x. Tabs 7 and 20). Finally, with the dismissal of Birchfield as a party, Ms. Vinson did not have any claim against him at trial to warrant an evaluation of which party may have prevailed for purposes of taxing costs.

FP 48185123.1

Gray's win occurred without risks of further expense. The district court did not cite or attempt to distinguish *Royal Palm* or other cases provided on point. *See Royal Palm,* 38 F. 4th at 1379(a "tie" does not provide the basis for a "prevailing party" finding); *Smith v. Glasscock,* 2:18-cv-870-ECM, * 7 (M.D. Ala. Mar. 29, 2022)(Equity dictates costs should not have been taxed to either party because neither party had wholly prevailed against the other.); *Allstate Ins. Co. v. Jones,* 763 F. Supp. 1101, 1102 (M.D. Ala. 1991)(Rule 54 does not require taxation of costs but allows the judge's sound discretion in the application of equitable principles to allow, disallow or apportion costs in civil actions.); *Perry v. Serenity Behavioral Health Systems,* 2010 WL 11537703 at * 2 (S.D. Ga. Mar. 30, 2010)("Many courts approach mixed-outcome cases by requiring each party to bear their own costs.")

With the Court's opinion in *CRST* there is no basis to ignore a defendant's success in denying a plaintiff the relief sought. 578 U. S. at 431 ("The defendant has, however, fulfilled its primary objective whenever the plaintiff's challenge is rebuffed, irrespective of the precise reason for the court's decision.") The district court's finding Gray was a prevailing "counter-defendant" on the counterclaims incorporates this principle. Likewise, with the ruling of this Court in *Royal Palm,* 38 F. 4th at 1379, the district court had no legitimate basis for awarding costs to Gray on claims she won and ignoring those upon which Appellants prevailed.

52

**B.  Voluntary Dismissal Without Prejudice Does Not Support Prevailing Party Status**

Appellants had a good reason to dismiss the counterclaims the week before trial – Gray planned to introduce allegations of prior bad acts in defense of the counterclaims which would besmirch their character and require them to defend claims of non-parties, or stand mute to the accusations. (App'x. Tab 7). Attempting to avoid this trial strategy, when it was clear the district court would not bifurcate liability and damages, Appellants had to dismiss the counterclaims to avoid undue prejudice.

Gray did not suffer prejudice or unfair hardship due to the dismissals, and the district court cited to none in making the designation. This Court, ruling on a Rule 41 dismissal without prejudice, announced the governing principle is that where the defendant has been put to considerable expense in defending a claim, the opponent should not be allowed to dismiss the claim <u>without</u> prejudice absent some imposition of costs to balance the equities. *McCants v. Ford Motor Co., Inc.,* 781 F. 2d 855, 860 (11th Cir. 1986) *citing LeCompte v. Mr. Chip, Inc*., 528 F.2d 601, 603 (5th Cir.1976); 5 J. Moore, J. Lucas, & J. Wicker, Moore's Federal Practice Secs. 41.06 (2d ed. 1985); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2366 (1971). The district court here did not undertake any analysis of the equities to support the finding. (App'x. Tab 20).

FP 48185123.1

This principle does not apply to dismissal with prejudice and the district court failed to address the distinction in finding Gray a prevailing party. *See, e.g., McCants,* 781 F. 2d at 860 noting a consideration of time wasted defending a claim is compared to the usefulness of the work produced in a subsequent litigation, *and United States v. $70,700*, 929 F. 3d 1293, 1299 (11th Cir. 2019) which demonstrates a dismissal <u>without</u> prejudice leaves the victorious party subject to risks of further litigation. (App'x. Tab 17, p. 5). In sum, the motion to dismiss the counterclaim did not invoke the equitable powers of the district court to award Gray costs on the dismissal with prejudice, nor did she suffer prejudice warranting costs.

## CONCLUSION

In light of the foregoing, the verdicts against Appellants for assault and battery, punitive damages and the district court's finding Gray is a prevailing party should be reversed, vacated and rendered.

/s/*Marion F. Walker*
Marion F. Walker (ASB L73M-0734)
Attorney for Appellants
Melissa McDickinson and
David Birchfield

54

# CERTIFICATE OF COMPLIANCE

I certify this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B)(1), Fed. R. App. Proc., in that, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. Proc., this brief contains 12,840 words.

I further certify this brief complies with the typeface requirements of Rule 32(a)(5), Fed. R. App. Proc., and the type-style requirements of Rule 32(a)(6), Fed. R. App. Proc., in that this document has been prepared using Word 14-point font in Time New Roman.

/s/*Marion F. Walker*
Marion F. Walker (ASB L73M-0734)
Attorney for Appellants
Melissa McDickinson and
David Birchfield

FP 48185123.1

# CERTIFICATE OF SERVICE

I hereby certify that on September 14, 2023, I filed four (4) copies of **Appellants' Initial Brief** with the Clerk of the Court by placing same in the United States mail, postage prepaid, and properly addressed, and electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Charles E. Guerrier<br>ceguerrier@haynes-haynes.com<br>**Haynes & Haynes, PC**<br>1600 Woodmere Drive<br>Birmingham, AL 35226<br><br>Heather Newsom Leonard<br>Heather@HeatherLeonardPC.com<br>**Heather Leonard, P.C.**<br>2105 Devereux Circle, Suite 111<br>Birmingham, AL  35243<br><br>Cynthia Forman Wilkinson<br>cwilkinson@wilkinsonfirm.net<br>**Wilkinson Law Firm P.C**.<br>1317 Third Avenue North, Suite A<br>Birmingham, AL 35203<br><br>Alicia Kay Haynes<br>akhaynes@haynes-haynes.com<br>**Haynes & Haynes, PC**<br>1600 Woodmere Drive<br>Birmingham, AL  35226<br><br>**Attorneys for Plaintiff** | Rachel V. Barlotta<br>rbarlotta@bakerdonelson.com<br>**Baker, Donelson, Bearman,**<br>**Caldwell & Berkowitz, PC**<br>1901 Sixth Avenue North<br>Suite 2600<br>Birmingham, AL 35203<br><br>**Attorney for Koch Foods of Ala.,**<br>**LLC** |

*/s/ Marion F. Walker*
Marion F. Walker

FP 48185123.1